ILND 44 (Rev. 09/20)

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

## I. (a) PLAINTIFFS

DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff
*(Except in U.S. plaintiff cases)*

County of Residence of First Listed Defendant
*(In U.S. plaintiff cases only)*
Note: In land condemnation cases, use the location of the tract of land involved.

**(c)** Attorneys *(firm name, address, and telephone number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Check one box, only.)*

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question
   *(U.S. Government not a party.)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity
   *(Indicate citizenship of parties in Item III.)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Check one box, only.)*

| CONTRACT | TORTS | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**  **PERSONAL INJURY** | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 530 General | ☐ 530 General | ☐ 720 Labor/Management Relations | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| | 315 Airplane Product Liability   ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 535 Death Penalty | | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | 320 Assault, Libel & Slander | | ☐ 740 Railway Labor Act | ☐ 410 Antitrust |
| | ☐ 330 Federal Employers' Liability | **Habeas Corpus:** | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 340 Marine   ☐ 368 Asbestos Personal Injury Product Liability | ☐ 540 Mandamus & Other | ☐ 751 Family and Medical Leave Act | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 345 Marine Product Liability | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 555 Prison Condition | ☐ 791 Employee Retirement | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loan (Excludes Veterans) | ☐ 355 Motor Vehicle Product Liability | 560 Civil Detainee - Conditions of Confinement | Income Security Act | ☐ 480 Consumer Credit |
| | ☐ 360 Other Personal Injury | | | |
| ☐ 153 Recovery of Veteran's Benefits | 362 Personal Injury - Medical Malpractice   **PERSONAL PROPERTY**  ☐ 370 Other Fraud | | **PROPERTY RIGHTS** | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 160 Stockholders' Suits | ☐ 371 Truth in Lending | | ☐ 820 Copyright | |
| | | | ☐ 830 Patent | |
| ☐ 190 Other Contract | ☐ 380 Other Personal Property Damage | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 385 Property Damage Product Liability | | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 880 Defend Trade Secrets Act of 2016 (DTSA) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 891 Agricultural Arts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | | | ☐ 861 HIA (1395ff) |
| | 443 Housing/Accommodations | **IMMIGRATION** | | ☐ 862 Black Lung (923) |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/ Disabilities- Employment | ☐ 462 Naturalization Application | | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities - Other | ☐ 463 Habeas Corpus – Alien Detainee (Prisoner Petition) | | ☐ 896 Arbitration |
| 290 All Other Real Property | ☐ 448 Education | ☐ 465 Other Immigration Actions | | ☐ 864 SSID Title XVI |
| | | | | ☐ 865 RSI (405(g)) |
| | | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| | | | **FEDERAL TAXES** | ☐ 950 Constitutionality of State Statutes |
| | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | | ☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Check one box, only.)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District (specify)
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION ( Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

## VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

## VIII. REQUESTED IN COMPLAINT:

☐ Check if this is a **class action** under Rule 23, F.R.CV.P.

Demand $

CHECK Yes only if demanded in complaint:
Jury Demand: ☐ Yes  ☐ No

## IX. RELATED CASE(S) IF ANY *(See instructions)*:

Judge

Case Number

## X. Is this a previously dismissed or remanded case?

☐ Yes  ☐ No  If yes, Case #

Name of Judge

Date: _____

Signature of Attorney of Record _____

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD PERRY, individually and on behalf of all others similarly situated | § § § | |
| Plaintiffs | § | Civil Action No.: |
| v. | § § | |
| DEERE & CO. (d/b/a JOHN DEERE), | § § | **CLASS ACTION COMPLAINT.** |
| Defendant. | § § | **JURY TRIAL DEMANDED** |

Plaintiff Richard Perry, on behalf of himself and all others similarly situated ("the Class" and together, "Plaintiffs") allege upon personal knowledge as to itself and its own actions, and upon information and belief, including the investigation of counsel as follows:

## I.  NATURE OF ACTION

1.      This case is about Defendant John Deere's monopolization of the repair service market for John Deere ("Deere") brand agricultural equipment with onboard central computers known as engine control units ("ECUs"). Throughout history, farmers have been able to maintain and repair their own tractors as needed when necessary. Elsewise, they have had the option to bring their tractors to any mechanic who could fix them. However, in newer generations of its agricultural equipment, Deere has deliberately monopolized the market for Dealer Repair Services ("DRS"), the repair and maintenance services of its agricultural equipment with ECUs. Deere has made necessary tools and software needed to perform repairs inaccessible to farmers and independent repair shops. Furthermore, Deere's network of highly-consolidated independent dealerships (the "Dealerships") is not allowed, as expressly laid out in their agreements with Deere, to provide farmers or repair shops with access to the same software and repair tools the Dealerships have. As a result of Deere's deliberate excluding of farmers and independent repair shops from accessing the necessary resources for repairs, Deere and the Dealerships have cornered the DRS Market in the United States for agricultural equipment controlled by ECUs that are Deere branded and have thus derived supra-competitive profits from the sale of repair and maintenance services.

2.      This is an antitrust class action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) brought by Plaintiffs on their own behalf and on behalf of a class of persons and entities similarly situated. Plaintiffs seek to represent those persons and entities who purchased DRS from Defendant Deere and Co. (d/b/a John Deere) and Deere affiliated independent Dealerships and technicians in the DRS Market for Deere agricultural equipment from June 29, 2018 to the present.

3.      John Deere is the biggest member of the agricultural machinery market in the United States. Deere possesses dominant economic power in the market for tractors, large tractors,

and combine tractors in North America[1] and has a greater market share than its two closest competitors, Case New Holland and Kubota Corp., put together[2].

4.     Modern John Deere tractors, combines, and other agricultural equipment with ECUs (collectively referred to herein as "Tractors") have grown more advanced as time has gone on. Tractors manufactured in the 21st century require proprietary software and associated repair tools (collectively referred to as "Software") to keep them operational. For example, an owner of a Tractor may be able to replace the transmission on their equipment, but that Tractor will not operate unless proprietary Software from John Deere "approves" the newly-installed part. A farmer or mechanic may have the necessary mechanical parts and know-how to repair a Tractor, but without access to the Software will not be able to complete the repair. However, Deere has made it unavailable to individual owners and independent repair shops. Instead, Deere makes the full Software available only to Deere Dealerships and technicians, who are not permitted by Deere to sell it directly, only apply it.

5.     By making the Software, for all practical purposes, unavailable, Deere has succeeded in foreclosing competition in the multi-billion-dollar DRS Market.

6.     Deere and the Dealerships are highly motivated to prevent competition in a blatant attempt to increase their profits. Deere's business for DRS is multiple times more profitable than its sales of original equipment.

7.     Deere's monopolization of the DRS Market allows Deere and its Dealerships to charge and collect supracompetitive prices for its services. As a result. Plaintiffs and Class members have paid millions of dollars more for the DRS for their tractors than they would have paid in a truly competitive market.

---

[1] Jennifer Reibel, *Manufacturer Consolidation Reshaping the Farm Equipment Marketplace, Farm Equipment* (Aug. 29, 2018), https://www.farm-equipment.com/articles/15962-manufacturer-consolidation-reshaping-the-farm-equipment-marketplace.

[2] Peter Waldman & Lydia Mulvany, *Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor*, Bloomberg Businessweek (Mar. 5, 2020), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-gets-to-fix-an-800-000-tractor.

8. Deere has demonstrated that it understands that farmers have a right to repair their own Tractors, while at the same time misleading the public regarding how easy it is for farmers or independent repair shops to perform repairs without Deere's involvement.

9. After a trade group representing Deere made a highly-publicized promise in 2018 to make the necessary Software and tools available by January 2021, Deere has failed to follow through. In 2021, multiple investigative journalists attempted to determine whether the Software was available. The Dealerships' response was that, despite the promise, it was not.[3]

10. Deere continues to exploit its relationship with customers who have acquired extremely expensive Tractors, locking customers into paying for expensive and inconvenient DRS from Deere and its Dealerships. Deere has created an effective tying arrangement, whereby the purchase of DRS is tied to the initial acquisition of Deere Tractors.

11. Deere's motive behind restricting access to the Software is simple: Deere and its Dealerships did not want their revenue stream from service and repair—one with bigger profit margins than the sale or lease of equipment—to end when the equipment is purchased, as it often did in the past when Deere did not require itself to be involved.

12. Deere's scheme to prevent independent repairs creates additional revenue for Deere over the entire useful life of every piece of equipment it sells. DRS are *required* to keep the Tractors operational in the face of any repair needs.

13. Deere unlawfully stifles competition by blocking independent repair shops and reducing consumer choice. It would otherwise be a robust and competitive repair aftermarket, showing how Deere artificially increases DRS prices to supracompetitive levels.

14. Deere's aggressive, forced consolidation of its Dealerships also was implemented with the intent of further limiting price competition for DRS.

15. As a result of Deere's unlawful withholding of the necessary Software to perform repairs from farmers and independent repair shops and its forced consolidation of the Dealerships,

---

[3] Jason Koebler & Matthew Gault, *John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied.*, Vice Motherboard (Feb. 18, 2021), https://www.vice.com/en/article/v7m8mx/john-deere-promised-farmers-it-would-make-tractorseasy-to-repair-it-lied.

Plaintiffs and the Class paid artificially inflated prices for DRS during the Class Period. Prices in the DRS Market exceeded the amount that would have been paid if the prices had been determined by a competitive market. Plaintiffs and Class members were thus injured by Defendant's conduct.

16.    Deere's illegal monopoly of the DRS Market should be enjoined and dismantled. Plaintiffs and the Class should be reimbursed by Deere for the amount they overpaid for DRS as a result of the monopolization.

17.    Deere violated Section 1 of the Sherman Act by forcing consolidation of its affiliated Dealerships to eliminate inter-brand competition for DRS.

18.    Deere also violated Section 1 of the Sherman Act through its arrangements with Co-conspirator Dealerships to not sell the Software to farmers and independent repair shops and instead hold it back solely for their own use.

19.    Deere violated Section 1 of the Sherman Act through forcing Plaintiffs and Class Members to purchase DRS from Deere once they were locked in to ownership of an expensive Deere Tractor. Deere's tying arrangement between Deere Tractors and DRS had both the intent and effect of harming competition in the market for DRS.

20.    Deere also violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the DRS Market in a manner that harmed competition and injured the purchasers of DRS. Deere reduced choice and as a result increasing prices in this market to supracompetitive levels. Deere has also leveraged its monopoly power over Deere Software to tie sales of its Tractors to sales of DRS, violating of Section 2 of the Sherman Act.

21.    Deere has unjustly enriched itself by profiting from Plaintiffs' payment of supracompetitive prices for DRS in violation of the antitrust laws. Deere should be made to disgorge these profits back to Plaintiffs and the class.

22.    Plaintiffs seek declaratory and injunctive relief, treble and exemplary damages, costs, and attorneys' fees.

23.    As for equitable relief, Plaintiffs seek an order requiring Deere to make the necessary Software available, at reasonable cost, to individuals and repair shops.

## I.      JURISDICTION AND VENUE

24.    Plaintiffs bring this action on behalf of itself and the Class under Section 16 of the Clayton Act (15 U.SC. § 26) to secure injunctive relief against Defendant for violating Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and to recover actual and compensatory damage, treble damages, interest, costs and attorneys' fee for the injury caused by Defendant's conduct.

25.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

26.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are 100 or more members of the proposed class.

27.    Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. 28 U.S.C. §15(a), and 28 U.S.C. § 1391(b), (c) and (d) because Defendant Deere & Company transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

28.    The activities of Defendant as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate and foreign commerce of the United States.

## II.    PARTIES

29.    Plaintiff Richard Perry is an individual located in Oneida, New York. Plaintiff Richard Perry purchased a Gator tractor and three additional Tractors from Deere that needed repair continuously. In order to remedy the issues, Plaintiff Richard Perry had to take the Tractors to Dealerships and constantly was overcharged for DRS that he could have paid less for if he could have them repaired independently. He suffered antitrust injury as a result of Defendant's conduct alleged herein.

30.    Deere & Co. is a publicly-traded company headquartered in Moline, Illinois, in the

County of Rock Island.

31.  "Defendant" as used herein, includes, in addition to those identified specifically above, all of the named Defendant's predecessors, including companies that merged with or were acquired by the named Defendant, as well as Defendant's wholly-owned or controlled subsidiaries, dealerships, affiliated and/or authorized technicians, and/or Co-conspirators that sold DRS in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.

32.  Co-conspirators include independently-owned dealerships with agreements with Deere giving them the right to sell Deere Tractors and DRS. Based on recent data, out of the 1,544 Dealerships affiliated with Deere, 91% of these Dealerships are owned by a "Big Dealer," i.e., a dealer that owns 5 or more individual locations. Although not a complete list, the largest Dealership groups are Ag-Pro Companies (75 locations in 8 states), United Ag & Turf (53 locations in 6 states), C&B Operations (36 locations in 6 states), Papé Machinery (35 locations in 5 states); RDO Equipment (32 locations in 9 states); Brandt Holdings (32 locations in 5 states); Greenway Equipment (31 locations in 2 states); Van Wall Group (31 locations in 4 states); and Quality Equipment (28 locations in 2 states).

## III.  RELEVANT MARKETS

33.  The principal relevant market to assess Defendant's anticompetitive conduct is the DRS.

34.  The DRS Market is made up of various services and labor to repair, maintain, and clear fault codes from Deere Tractors[4].

35.  There are no available substitutes for DRS. DRS are not interchangeable with any other manufacturers' service as the DRS Market is controlled completely by Deere. Any other repair service will not work for the Tractors.

---

[4] As defined *supra*, Deere "Tractors" for purposes of this litigation include all John Deere tractors, combines, and other agricultural equipment with ECUs.

36. The relevant geographic market is the United States.

37. Defendant Deere has market and monopoly power in the relevant market through its control over access to the Software and as a result DRS.

38. Any independent repair shops who want to compete with Deere in the DRS Market face insurmountable barriers. Defendant's effective total control of the Software means that independent repair shops are unable to access the necessary resources to be able to compete with Deere. Similarly, any farmers who wish to perform their own repairs and/or maintenance cannot access the resources necessary to do so. Put simply, one cannot access DRS without explicit approval from Deere.

39. Independent repair shops and farmers are unable to compete in the DRS Market without access to the Software. Deere does not give out access to the Software.

40. Deere Software Market. As discussed above, Defendant maintains market and monopoly power over the market for Deere Software. There is no available substitute for Deere Software, and it is not interchangeable with any other manufacturers' product.

41. Tractor Markets. The DRS market and the market for Tractors are distinct. The "Tractor Markets" include the United States product markets for agricultural farm tractors. This Market includes 2WD Farm Tractors, Compact Tractors, 4WD Farm Tractors, Row Crop Tractors, Scraper Tractors, Specialty Tractors, Utility Tractors, and Self-Propelled Combines.

42. Defendant Deere is the largest agricultural machinery company in the world and has appreciable economic power in the U.S. Tractor Markets.

## IV.    TRADE AND COMMERCE

43. During the Class Period, Defendant, directly or through its subsidiaries or affiliated Dealerships, sold DRS in the United States continuously into interstate commerce and foreign commerce, including through and into this judicial district.

44. During the Class Period, Defendant controlled 100% of the market for DRS in the United States.

45. Defendant's business activities substantially affected interstate trade and commerce

in the United States and caused antitrust injury in the United States as a result.

## V.     FACTUAL ALLEGATIONS

### A. Technology in John Deere Tractors

46.    Modern Deere Tractors are complex machines. These Tractors run firmware that is necessary for basic functions. In the past the functions were not locked behind such requirements. Without the firmware, the product is incomplete and will not run. Thus, the firmware is crucial to the basic functioning of a Tractor. It is in essence the same as the engine or transmission. The code that runs the internal engine and the transmission components are a part of the machine that it will not work without.

47.    The central computer on a Tractor is the Engine Control Unit, or "ECU." The ECU determines whether the Tractor is able to function.

48.    Like cars, John Deere Tractors use a large number of sensors throughout that are constantly monitored by the ECU. When a sensor picks up on an error, it can put the machine into "limp mode," allowing farmers to move the machine very slowly but not fully operate it. When the problem is fixed, the error code is cleared and the machine can continue working as normal.[5]

49.    The John Deere S760 combine harvester has 125 different computer sensors in it. If any one of those sensors throw an error code, the combine will enter limp mode.

50.    Troubleshooting Deere Tractors requires Software that Deere refuses to make available publicly.

51.    Since about 2000, Deere Tractors began using what is known as "CAN bus" systems in their machinery, standing for Controller Area Network. CAN bus is a central electrical system that allows communications between different parts of the machinery. Sales manuals for Deere Tractors explain that an advantage of the system is that it "allows the technician at the dealership to plug into the system using the Service ADVISOR™ computer program. The Service ADVISOR program links up to the tractor's electrical system to read the communications between

---

[5] Koebler & Gault, *supra* note 3.

the controllers to determine where the problem is located and how it can be fixed."[6]

52.    Service ADVISOR, per John Deere's own sales manual materials, is a tool used by John Deere dealerships capable of providing technical and mechanical support for technicians and service managers through the use of a laptop computer.

53.    Service ADVISOR provides symptom-based diagnostics information, specific machine information, and electronic technical information. It also offers a connection to John Deere help and solutions through an extranet connection at the workshop and out in the field. Service ADVISOR is a diagnostic testing system for all CAN bus tractors. This system is the cutting edge of service technology and will save time and money by faster equipment repair.

54.    Even if the farmer is actually able to interpret the error code and determine what the problem is with the Tractor, he is unable to fix it on his own. Farmers must call a Dealership to repair or clear fault codes for their machine.

55.    Farmers report their Tractors shutting down from computer faults and having to sit and wait for a John Deere technician to arrive while they lose valuable time. The fact that they cannot independently repair their machines hurts their business.

56.    Without access to the Software and other tools needed to diagnose and repair the error, farmers must rely on Deere dealerships and technicians to travel to them and clear the error codes.

57.    Replacing parts on a Tractor also can result in "bricking" of the machine if the proper Software is not used. After a new part is installed on a Tractor, the Service ADVISOR program needs to be connected to the ECU to authorize the new parts. If the new part is not "authorized" by the Software, the engine of the Tractor will not start. This renders the Tractor useless to its owner until the owner pays a Deere technician to authorize the repair and restore operation of the Tractor.

---

[6] *See* John Deere & Co Sales Manual, Electrical, CAN bus electrical system (2013), http://salesmanual.deere.com/sales/salesmanual/en_NA/tractors/2011/feature/electrical_and_lights/6030p_7030p/6030_7030_can_bus_story.html.

58.     During harvest time, when Tractors, including combines, are running at full throttle for weeks on end, it's common for mechanical issues to arise. Farmers are unable to repair issues on their own without using a Deere authorized service.

59.     As of 2021, the reported cost for DRS from Deere itself or an authorized Dealer ranged from $150–$180 per hour. This is not inclusive of additional charges for travel and parts.

60.     This is a nightmare for many farmers. When a farmer calls a dealer to perform a repair, the farmer cannot work outside of the dealer's schedule and must pay whatever the cost is even if the problem could be fixed trivially with access to the Software.

61.     Farmers also may work significant distances from the nearest dealership or technician. Should their Tractor need service, they have to pay sizeable amounts for travel time or the cost of having their equipment hauled to a dealership.

62.     These additional costs paid to Deere by farmers cut into an already razor-thin profit margin on crops. Farmers in the United States are currently experiencing drastically increasing operating expenses while crop yields remain nearly the same. For example, between 1996 and 2020, total costs for growing corn increased by 193% while yields only increased by 13.7%. In that same period, costs for growing soybeans increased by 202% while yields increased only by 12.3%.

63.     As a result, farmers have had difficulty paying their debts— estimated in the hundreds of billions in 2019. The rate of farm bankruptcies has accelerated.

64.     Furthermore, given farmers' financial interest their Deere Tractors, which can run upwards of half a million dollars, they have no reasonable choice but to pay for DRS.

65.     The farmers are locked in the Deere Tractor ecosystem. Switching costs are high and farmers expect to be able to use a Tractor for decades.

66.     While some farmers own these expensive machines outright, many farmers lease the equipment. The leaseholder is often Deere itself, which has become the fifth-largest

agricultural lender in the sector.[7]

## B. Deere's Longtime Strategy of Forced Dealership Consolidation.

67.     In addition to being forced to purchase DRS from Deere, farmers in many areas are faced with a lack of choice as to which Dealership to purchase DRS from.

68.     This lack of meaningful choice is in large part due to Deere's concerted efforts to force Dealerships to consolidate or lose their affiliation with Deere.

69.     Starting approximately in the early 2000s (and coinciding with when ECUs were first being widely used in Deere Tractors), Deere implemented an aggressive strategy that pressured Dealerships to consolidate.

70.     In a series of meetings in the summer of 2002, Deere told dealers they should plan on a future in which they would either be a buyer or a seller.[8] One former owner of a dealership said that in 2002 he began receiving letters, emails, and visits from Deere officials almost monthly urging him to either acquire another dealer or cash out from his business.[9]

71.     Deere's strategy worked. In 1996, the total number of Deere Dealership locations was approximately 3,400. By 2007, this number had decreased to 2,984. In 2021, only 1,544 Dealership locations remained. Only 144 of these Dealerships are not owned by "Big Dealers," i.e., Dealerships that operate five or more individual Dealership locations. Very few single location dealerships remain in the country.

72.     In 2009, a former owner of a Deere-affiliated dealership, Roy Dufault, reported to, a weekly agricultural newspaper that representatives from Deere pressured him to sell his small dealership. Deere told him that for the large dealers in the area to continue to grow, Dufault needed to get out of the way, as his dealership was a hindrance to their profitability.[10] Deere's

---

[7] Jesse Newman & Bob Tita, *America's Farmers Turn to the Bank of John Deere*, Wall Street
Journal (July 18, 2017), https://www.wsj.com/articles/americas-farmers-turn-to-bank-of-john-deere-1500398960.
[8] Ilan Brat & Timothy Aeppel, *Why Deere Is Weeding Out Dealers Even as Farms Boom*, Wall
Street Journal (Aug. 14, 2007), https://www.wsj.com/articles/SB118705668767896842.

[9] *Id.*

[10] *John Deere leaves a dealer and his customers high and dry*, AgWeek (Sept. 21, 2009),

representatives told Dufault that there was no need for a location in Fosston, and that another dealership could cover the area remotely. At the time Deere ended its dealer agreement with Dufault, customers expressed their concern about where they would have their Deere equipment serviced. In 2021, there is not a Deere Dealership within 20 miles of Fosston, and none within 100 miles that are not owned by a Big Dealer.

73.    In the last decade, the industry-wide number of agricultural equipment stores owned by Big Dealers increased by a significant fraction.[11] And while this large degree of consolidation among agricultural stores in general is substantial, Deere is a noticeable outlier in number of affiliated Dealerships owned by Big Dealers. In the entire industry, the total percentage of Big Dealer-owned Agricultural Equipment Stores is only roughly 35%, whereas a full 91% of Deere's "Independent" Dealerships are owned by Big Dealers.

74.    The staggering amount of consolidation among Deere Dealerships is the result of Deere dividing and conquering small Dealers by coercing them to sell to a larger dealer. If a single-location Dealer wants to sell the business, Deere says who the purchaser can be, funneling Dealership sales to its handpicked Big Dealers. Deere will end its affiliation with the Dealership altogether if the Dealership refuses to sell to the specified buyers.

75.    Deere's consolidation has eliminated or reduced competition among Deere Dealerships. This lack of competition boosts profitability for the Dealerships and Deere. Deere benefits not only from forcing farmers to purchase DRS from Deere Dealerships, but also from forcing farmers to buy these DRS in a market that Deere has manipulated to be less competitive.

**C. Deere's Promise—and Failure—To Provide the Full Spectrum of Repair Tools.**

76.    Because of how difficult and expensive Deere had made it for farmers to repair their Tractors, a growing "right to repair" movement began to focus on farmer's rights to repair John Deere agricultural equipment.

---

https://www.agweek.com/news/john-deere-leaves-a-dealer-and-his-customers-high-and-dry.

[11] Kim Schmidt, *Big Dealers Continue to Get Bigger*, Ag Equipment Intelligence (Apr. 22, 2021), https://www.agequipmentintelligence.com/articles/4798-big-dealers-continue-to-getbigger.

77.    Deere has a history of fighting customers' access to the onboard technology on Deere Tractors. In 2015, Deere argued that Section 1201 of the Digital Millennium Copyright Act gave it power to prevent purchasers of Deere Tractors from bypassing Technical Protection Measures "for the purposes of lawful diagnosis and repair, or aftermarket personalization, modification, or other improvement." This was, purportedly per Deere, because the owners did not actually own the software that made the Tractor run. Deere argued that the owner only "receives an implied license for the life of the vehicle to operate the vehicle."[12]

78.    When this argument proved unconvincing to the U.S. Copyright Office and bypassing Technical Protection Measures on agricultural equipment for the purpose of repair was deemed to be fair use, Deere took another approach to blocking farmers from accessing Tractor Software.

79.    In 2016, Deere issued an end-user "License Agreement for John Deere Embedded Software" that forbade customers from accessing, reverse-engineering, or modifying the software running on its Tractors (the "EULA").[13] Deere states it "may terminate the license [to the embedded Tractor software] granted under this License Agreement . . . if you violate any material term of this License Agreement. . ."[14]

80.    As public awareness of and frustration with increasingly prohibitive repair restrictions grew, state lawmakers began to act. As of 2021, more than half the states have introduced some form of "right to repair" legislation. A proposed bill in Minnesota would require manufacturers to "make available, on fair and reasonable terms, documentation, parts, and tools, inclusive of any updates to information or embedded software, to any independent repair provider

---

[12] Deere & Company, *Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201*, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf (last accessed Jan. 4, 2022).

[13] *License Agreement for John Deere Embedded Software*, https://www.deere.com/assets/pdfs/common/privacy-and-data/docs/agreement_pdfs/english/2016-10-28-Embedded-Software-EULA.pdf (last accessed June. 3, 2022).

[14] *Id.*

or to the owner of digital electronic equipment manufactured by or on behalf of, or sold by, the original equipment manufacturer for purposes of diagnosis, maintenance, or repair."[15]

81.    In September 2018, the Equipment Dealers Association ("EDA"), a trade and lobbying group that represents John Deere and other manufacturers and often acts as Deere's mouthpiece, made a promise intended to stave off increasing pressure from customers and lawmakers to pass similar "right to repair" legislation pending around the country.[16]

82.    The EDA committed to make repair tools, Software, and diagnostics available to the public by January 1, 2021[17] - going so far as to put out a "Statement of Principles," laying out this promise. In a heavily-publicized ceremony and photo op, the EDA signed a "Memorandum of Understanding" with the California Farm Bureau that enshrined this statement of principles.[18]

83.    The statement of principles reads as follows:

**STATEMENT OF PRINCIPLES:**

To the extent not already available, the maintenance, diagnostic and repair information listed below will be made available to end users through authorized agricultural dealers at fair and reasonable terms, beginning with tractors and combines put into service on or after January 1, 2021. End users will also be able to purchase or lease diagnostic tools through authorized agricultural dealers. Certain information and tools may be available earlier. Agricultural dealers are committed to provide access to:

- Manuals (Operator, Parts, Service)
- Product Guides
- Product Service Demonstrations, Training, Seminars or Clinics
- Fleet Management Information
- On-Board Diagnostics via diagnostics port or wireless interface
- Electronic Field Diagnostic Service Tools and training on how to use them
- Other publications with information on service, parts, operation and safety

Using this information and these tools, which will be available for purchase, lease or subscription from dealers, farmers will be able to identify and repair numerous problems they may encounter with their equipment. FWEDA and CFBF support equipment users' ability to maintain, diagnose and repair their machinery. However, the ability to diagnose and repair does not mean the right to modify. For safety, durability, environmental and liability reasons, diagnostic and repair information and tools will not permit consumers to do the following:

- Reset an immobilizer system or security-related electronic modules,
- Reprogram any electronic processing units or engine control units,
- Change any equipment or engine settings negatively affecting emissions or safety compliance,
- Download or access the source code of any proprietary embedded software or code

---

[15] Digital Fair Repair, HF 1138, 91st Leg., 2nd Engrossment (Minn. 2020), https://www.revisor.mn.gov/bills/text.php?number=HF1138&type=bill&version=2&session=ls91&session_year=2019&session_number=0.

[16] Koebler & Gault, *supra* note 3.

[17] *Agreement Streamlines Repair of High-Tech Farm Equipment*, Far West EDA (Sept. 9, 2018), https://fweda.com/industry-news/agreement-streamlines-repair-of-high-tech-equipment (last accessed June. 3, 2022).

[18] Koebler & Gault, *supra* note 3.

84. As journalists from the magazine Vice noted, the commitment "did not promise to actually sell repair parts, and it also contains several carve-outs that allow tractor manufacturers to continue using software locks that could prevent repair."[19]

85. Three years later in mid-2021, farmers still struggle to get anything promised in the agreement with the EDA.

86. Posing as a customer, a Right to Repair advocate called 12 John Deere dealerships in six states. Of those, 11 told him that they don't sell diagnostic software, and the last one gave him an email of someone to ask for the tools. When him sent an email to the individual identified as a point of contact for tools, he did not receive a response.[20]

87. Similarly, journalists who tried to assess the availability of the Software called nine dealerships in seven states and were told by representatives that the things promised by the EDA were simply not available. The journalists called three dealerships in California; two said no immediately, and a third told the journalists that the repair software and tools could not be sold to the public and required the purchaser to be a licensed dealer – contrary to what the EDA said.[21]

88. A spokesperson for the Association of Equipment Manufacturers ("AEM"), another manufacturers' lobbying and trade group that often represents Deere, told Vice that, "Comprehensive repair and diagnostic information is now available for the vast majority of the tractor and combine market through authorized dealers."

89. However, the spokesperson failed to respond when Vice asked if the spokesperson could point to a single instance where this is actually the case, or even one manufacturer that explains to farmers where they can get the tools or information.

90. Deere has continued to insist that much of the information is readily available,

---

[19] Jason Koebler, *Farmer Lobbying Group Sells Out Farmers, Helps Enshrine John Deere's Tractor Repair Monopoly*, Vice Motherboard (Sept. 11, 2018), https://www.vice.com/en/article/kz5qgw/california-farm-bureau-john-deere-tractor-hackingright-to-repair.

[20] Koebler & Gault, *supra* note 3.

[21] *Id.*

despite all evidence to the contrary, while pulling the wool over the eyes of regulators by agreeing that farmers have the right to repair their own equipment.[22]

91.    Over the last few years, Deere and industry spokespeople have taken contrary positions, equivocating regarding what tools and Software are actually required in order to make and complete repairs on Tractors. Deere and industry representatives have stated at various times that: (1) customers can do 98% of repairs on Deere Tractors without access to the tools that Right to Repair advocates have pushed for;[23] (2) the repair tools have actually been available to farmers and independent repair shops for years;[24] and, now most recently, that (3) the repair tools are now available, but Deere has not prioritized adequately communicating this to the dealerships or customers.[25]

92.    If these tools were actually available to farmers and independent repair shops, then Deere could just point to where they could be accessed and where they could be purchased. Although it cannot point to any real-world examples where this is the case or where they are for sale, the company and its industry representatives insist that these tools are available.

93.    In 2020, one owner of an independent equipment mechanic shop in Nebraska

---

[22] *Id.*

[23] Nilay Patel, *John Deere Turned Tractors Into Computers – What's Next?,* The Verge (June 15, 2021), https://www.theverge.com/22533735/john-deere-cto-hindman-decoder-interview-right-torepair-tractors ("The statistics are real: 98 percent of the repairs that happen on a product can be done by a customer today.").

[24] Ag Equipment Intelligence, *supra* note 27 ("for many years, John Deere has supported our customers' right to repair their equipment…[w]e've offered a broad range of diagnostic, maintenance and repair tools for farmers that are available through John Deere dealers."); *see also* Deere & Co. Position Paper (uploaded by Vice Motherboard on Feb. 14, 2017), *available at* https://www.scribd.com/document/339340098/John-Deere-letter#from_embed ("John Deere [] provides access to service information and diagnostic information for both producer customers and non-producers. The format and cost of this access is similar to those charged our authorized John Deere dealers.").

[25] Ag Equipment Intelligence, *supra* note 27 (citing David Gilmore, Senior Vice President, Sales and Marketing Regions 3 & 4 at John Deere, stating that Deere had met all the requirements laid out in the Vice Article) ("we've met all of the commitments that we made to the industry and to our customers, in terms of providing them with the tools and the software that they need to not only maintain and diagnose but also repair their machines.").

reported that about half of the repairs he sees involve code faults triggered by emission-control systems. The faults render vehicles inoperable, and while the shop can replace the exhaust filters and particulate traps that might throw a Tractor's code, the dealerships would not provide the Software necessary to restart the Tractor. This forced the owner or the shop to take the machine to a Deere dealership or be forced to pay for a Deere mechanic to make a house call with the Software.[26]

94.     The EDA blamed a "lack of communication" as the culprit for why most farmers and media think the Software and tools remain unavailable to them and assured that industry organizations like the EDA would "step up to bridge that communication gap" by "educating dealers… focusing on the fundamentals like putting information on our websites and using social media to promote these resources."[27]

95.     Since the Ag Equipment Intelligence article was published quoting Higgins on March 30, 2021, the EDA has yet to post on their frequently-updated Twitter page about where farmers or independent repair shops could access these resources.

96.     Instead, the *only* Tweets by the EDA referencing "repair" in any way since March of 2021 are those *opposing* Right to Repair.[28]

97.     Around that same time, Deere issued a company statement that "John Deere supports a customer's right to safely maintain, diagnose and repair their own equipment."[29] Deere is also quoted saying "[w]hen customers buy from John Deere, they own the equipment and can choose to personally maintain or repair the product."[30]

98.     By implying that owning a Deere Tractor does not require farmers to rely on

---

[26] Waldman & Mulvany, *supra* note 2.

[27] Ag Equipment Intelligence, *supra* note 27.

[28] EDA (@Equip_Dealers), Twitter https://twitter.com/Equip_Dealers.
[29] Tyne Morgan, *AEM, John Deere Respond to Biden's Planned Executive Order Over Right to Repair Equipment*, AgWeb Farm Journal (July 7, 2021).

[30] *Id.*

Dealerships for repairs, Deere intentionally obfuscates the truth that the Software is necessary for diagnosis and completion of a large number of these repairs. Deere's misleading statements fail to provide information on the scope of repairs and maintenance that can be accomplished without the Software, preventing farmers from being able to accurately assess the overall cost of owning a Deere Tractor.

**D. To the Extent Deere Has Made Diagnostic and Repair Tools Available, They Are Insufficient to Restore Competition to the DRS Market.**

99.     Beginning sometime around June 2021, John Deere quietly created a web page on their main company site[31] for a product called Customer Service ADVISOR, with a form to "request more info" about a subscription.

100.     One dealer website describes Customer Service ADVISOR as a way for customers to access "much of the same" technical and diagnostic information used by dealership technicians.[32] However, this pared-down system explicitly does not include every feature that dealers have access to, and costs start at $8,500 for the first year alone.[33] If Deere charges customers the same amount per year, in six years this would result to an extra $51,000 paid by customers who want to perform their own repairs. Over the course of the lifetime use of a Deere Tractor, the cost to maintain access to the Software necessary to individually perform repairs could amount to the total price of the Tractor itself – essentially a complete write off.

101.     Furthermore, there is no indication that Deere will provide sufficient repair tools to independent repair shops or, for that matter, even to customers. The only apparent way to access materials is to place a request with an individual dealership, and there is no guarantee or timeline of when Customer Service ADVISOR is available.

102.     It is also unclear if Deere is simply calling attention to the already-existing,

---

[31] Customer Service ADVISOR™, John Deere, https://www.deere.com/en/parts-and-service/manuals-and-training/customer-service-advisor/ (last accessed Jan. 4, 2022).
[32] Customer Service Advisor, United Ag & Turf,
https://www.unitedagandturf.com/service/customer-service-advisor/ (last accessed Jan. 4, 2022).

[33] *Id.*

extremely limited capability customer version of Service ADVISOR. This barebones version allows a customer to troubleshoot codes but offers minimal functionality otherwise. A farmer or independent repair shop is not able to use the software, for example, to replace a sensor and recalibrate a Tractor. As one employee of a Deere dealership described it in 2016, the customer version is "a waste of your money."[34] The same employee also described the version of Customer Service Advisor as "similar to [Service Advisor] but they really give you only enough to help your dealer cut down on the labor if you troubleshoot it yourself. If they let you calibrate, us dealer guys wouldn't have any work".[35]

103.   Deere continues to carefully guard access to the Software necessary to make repairs, and to the extent it has made a watered-down version of it available to its customers, it has priced it so high that the access to the Software will be an unattractive option to most customers, even in comparison to the high cost of paying Deere for DRS. This arrangement thus allows Deere to claim it has provided repair and diagnostic materials to its customers while posing virtually no risk to Deere's monopoly in the DRS Market.

**E. There Are No Legitimate Reasons to Restrict Access to Necessary Repair Tools.**

104.   In May 2021, the FTC issued a report titled "Nixing the Fix: An FTC Report to Congress on Repair Restrictions" that examined in part how repair restrictions implemented by various industries increase costs and limit consumer choice, and how these restrictions might implicate federal consumer protection and antitrust laws.[36]

105.   The report included knowledge from a July 16, 2019 workshop, as well as public

---

[34] *JD Service Advisor*, The Combine Forum, post by hake2651 (Feb. 26, 2016), https://www.thecombineforum.com/threads/jd-service-advisor.253730/.

[35] *JD Service Advisor*, The Combine Forum, post by hake2651 (Feb. 29, 2016), https://www.thecombineforum.com/threads/jd-service-advisor.253730/.

[36] Federal Trade Commission, *Nixing the Fix: An FTC report to Congress on Repair Restrictions* (May 2021), *available at* https://www.ftc.gov/reports/nixing-fix-ftc-report-congress-repair-restrictions (hereinafter "FTC Report").

comments, responses to a Request for Empirical Research and Data, and independent research.[37] The FTC concluded there was "scant evidence to support manufacturers' justifications for repair restrictions" and that access to what is necessary to repair is "well-supported by comments submitted for the record and testimony provided at the Workshop."[38]

106.    The FTC also received research submissions and comments from the EDA and AEM. The FTC noted that restricting repairs to authorized repair networks was not automatically justified just because of the existence of possible safety concerns from independent repairs. The FTC noted that manufacturers provided no factual support for their assertion that "authorized repair persons are more careful or that individuals or independent repair shops fail to take appropriate safety precautions."[39] Likewise, the FTC pointed out that manufacturers had failed to offer actual evidence that providing normal people and shops access to the same tools made available to authorized service providers created additional security risks.

107.    The FTC concluded "[m]anufacturers can provide others with the same parts and tools that they provide to their authorized service providers. And, by providing access to individuals and independent repair shops, manufacturers would have greater confidence in the repair activities that occur outside of their authorized networks."[40]

108.    The FTC stated that, beyond simple unsupported of liability exposure and reputational harm, manufacturers "provided no empirical evidence to support their concerns about reputational harm or potential liability resulting from faulty third-party repairs."[41]

109.    The report concluded that manufacturers' arguments regarding the "superior service" were anecdotal at best. There was evidence that consumers tended to be satisfied with

---

[37] FTC Report, p. 3.

[38] FTC Report, p. 6.

[39] FTC Report, p. 28.

[40] FTC Report, p. 31.

[41] FTC Report, p. 33.

repairs made by independent repair shops.

110.    The FTC concluded that "[t]he record does not establish that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."[42]

111.    There is no basis for Deere to withhold the full spectrum of Dealer level Software that a farmer or independent repair shop would need to diagnose or perform repairs on Tractors.

112.    The car industry is a counterpoint to Deere's arguments. Industrywide, vehicle owners and independent repair shops have had access to Dealer-level diagnostic and repair tools from the manufacturers for nearly eight years. In 2014, the automotive industry through representative trade organizations voluntarily agreed to make available for purchase the same diagnostic and repair information, including repair technical updates, that manufactures make available to its dealers through the manufacturer's internet-based diagnostic and repair information system or other electronically accessible manufacturer's repair information system.[43]

## F. Deere Has Not Provided Farmers and Independent Repair Shops with the Necessary Software and Continues to Misrepresent the Issue.

113.    To the extent that Deere has made limited repair information and tools available, it has been insufficient to open the DRS Market to true competition. Deere must provide access to the full spectrum of tools that the dealers have to both farmers and independent repair shops.

114.    Deere has resisted making the Software and tools available to farmers and independent repair shops under the auspices of "ensur[ing] continued compliance with emissions, operator safety and other regulatory requirements."[44]

---

[42] FTC Report, p. 38.

[43] Memorandum of Understanding, Automotive Aftermarket Industry Association, Coalition for Auto Repair Equality, Alliance of Automobile Manufacturers, and Association of Global Automakers (Jan. 15, 2014) (emphasis added), https://www.autocare.org/docs/default-source/government-affairs/r2r-mou-and-agreement-signed.pdf.

[44] Deere & Co Position Letter on Kansas HB 2122: Digital Electronic Repair Requirements, *available at* https://www.vice.com/en/article/mgxayp/source-apple-will-fight-right-to-repairlegislation.

115.    Deere's claims that providing access to Software and repair tools would allow farmers to bypass emissions and safety controls is untruthful.

116.    There is a significant difference between resetting an error code and ignoring or overriding safety codes. Overriding emissions or safety controls requires a different set of modification tools, which are not the tools used for diagnosis and repair. The FTC pointed out that data submitted to it by the EDA that ostensibly showed that modifications of agricultural equipment affected emissions was incorrectly applied, "because [the data] concerns modifications to equipment as opposed to repairs."[45] The FTC also noted conversations with AEM and EDA representatives confirmed the limitations of the submitted studies.[46]

117.    It would be illegal to override emission controls on a Tractor. The entire operating system on the machine would have to be completely removed and then replaced with new, modified software that does not have emission control or authorizes farmers to ignore it. This is illegal and not at issue in this litigation.[47]

118.    Deere and industry groups have latched onto this talking point—conflating "repair" and "modification"—in their successful attempt to foreclose others from the market and thereby maintain Deere's monopoly in the DRS Market.

## G. Defendant's Monopolization of the DRS Market Has Led to Artificially High Prices and Record Profits for John Deere.

119.    Deere has a clear and obvious motive for restricting access to the Software and maintaining its unlawful tying arrangement and monopoly and attempted monopoly in the DRS Market: significantly increasing their profits.

120.    For Deere and its Dealerships, parts and services are three to six times more profitable than sales of the actual Tractors. The repair segment of Deere's business has also been

---

[45] FTC Report, p. 38.

[46] FTC Report, p. 38, n. 205.

[47] Kevin O'Reilly, U.S. PIRG, *Deere in the Headlights: How software that farmers can't access has become necessary to tractor repair* (Feb. 2021), https://uspirg.org/feature/usp/deere-headlights.

growing faster than Tractor sales. From 2013 to 2019, Deere's annual parts sales went up 22%. The company's total agricultural equipment sales went down 19% in this same period.[48]

121.    During this period where Deere's Tractors with ECUs reached greater market penetration and as Deere continued to eliminate small Dealerships the company's income skyrocketed. In 2000, Deere's net income was around $500,000,000. Deere's 2021 net income is $5.963B, over 11 times its income from 2000, and over twice its net income of $2.75B in 2020. [49]

122.    Although Deere does not provide a complete itemized breakdown of its profits in its filings, sales of "parts and maintenance services" are reported to account for a fifth of Deere's sales.[50]

123.    In the last several years, the reported profit margins not associated with direct sales of equipment increased dramatically. The company told investors in 2020 that it was counting on its parts and maintenance services business to contribute 50 basis points in increased profits over the next two years.[51]

124.    Without access to the Software to perform repairs and clear fault codes, owners of Deere Tractors have been forced to give Deere and its Dealerships more money for DRS. The sum for DRS is more than would have been expended had they been able to do the repairs themselves or hired less expensive, and often more convenient, independent repair shops to perform the repairs.

125.    One farmer reported that he purchased a new Tractor for $300,000 and spent nearly $8000 clearing fault codes over the course of a few years.[52]

---

[48] Waldman & Mulvany, *supra* note 2.

[49] https://www.deere.com/en/news/all-news/fy21-fourth-quarter-earnings/

[50] Rajesh Kumar Singh, *Deere bets on cost cuts, services push to boost profits*, Reuters (Jan. 8. 2020), https://www.reuters.com/article/us-deere-strategy/deere-bets-on-cost-cuts-services-pushto-boost-profits-idUSKBN1Z72TA.

[51] *Id.*

[52] *Id.*

## VI. CLASS ACTION ALLEGATIONS

126. Plaintiff bring this action on behalf of himself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedures, seeking damages and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities residing in the United States who, during the Class Period of June 29, 2018 to the present, purchased DRS for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians.

127. Specifically excluded from the Class are Deere and its employees, affiliates, subsidiaries, and joint venturers, whether or not named in this Complaint.

128. Class Identity. The above-defined Class is readily identifiable and is one for which records should exist with Deere and the Dealers' sales records.

129. Numerosity. Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendant. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all the numerous class members is impracticable.

130. Typicality. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased DRS from Defendant to service his Tractors, and thus Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

131. Common Questions Predominate. There are questions of law and fact common to the Class, including, but not limited to:

    a. Whether the United States DRS Market constitutes a Relevant Market;

    b. Whether Deere possesses market power in this Relevant Market;

    c. The effect of Defendant's alleged monopolization or attempted monopolization on the prices of DRS sold in the United States during the Class Period;

d.   Whether Deere operating an illegal tying scheme regarding the sale of DRS and Deere Tractors in violation of Section 1 of the Sherman Act;

e.   Whether Deere monopolized or attempted to monopolize the DRS Market in the United States in violation of Section 2 of the Sherman Act;

f.   Whether Deere engaged in monopoly leveraging by using its monopoly power in the Deere Software Market to gain or attempt to gain or maintain monopoly power in the DRS Market in violation of Section 2 of the Sherman Act;

g.   Whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

h.   Whether Deere colluded with Co-conspirator Dealerships to suppress competition for DRS between Deere Dealerships in violation of Section 1 of the Sherman Act;

i.   Whether Deere colluded with Co-conspirator Dealerships to prevent farmers and independent repair shops from having access to the Software in violation of Section 1 of the Sherman Act;

j.   Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

k.   The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

132.   **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased DRS from Defendant and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to representhimself and the

Class.

133. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution of this matter as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Thus, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

134. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

135. Plaintiff brings this case on behalf of the Class and all persons and entities similarly situated pursuant to Rule 23, on behalf of all persons and entities that purchased DRS that Defendant provided during the Class Period.

136. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**VII.    ANTITRUST INJURY**

137. Defendant's anticompetitive conduct had the following effects, among others:

    a.  Price competition has been restrained or eliminated with respect to DRS;

    b.  The prices of DRS have been fixed, raised, stabilized, or maintained at artificially inflated levels as a result;

    c.  Purchasers of DRS have been deprived of free and open competition; and

    d.  Purchasers of DRS, including Plaintiff, paid an artificially inflated price for

DRS.

138. The purpose of Deere's conduct was to exclude competition and raise, fix, or maintain the price of DRS. As a direct and foreseeable result, Plaintiff and the Class paid supracompetitive prices for DRS during the Class Period.

139. By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for DRS than they would have paid in the absence of Deere's illegal conduct, and as a result have suffered damages.

140. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

### VIII.   CLAIMS FOR RELIEF

<u>COUNT ONE</u>

**Violation of Section 1 of the Sherman Act**

**Group Boycott**

**15 U.S.C. § 1**

141. Plaintiff incorporates and realleges, as though fully set forth herein, the allegations set forth in the preceding paragraphs of this Complaint.

142. Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of DRS in the United States. Defendant did this in order to artificially raise, fix, maintain, and/or stabilize prices in the DRS market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

143. Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to individual farmers and independent repair shops constitutes a per se violation of Section One of the Sherman Act.

144. Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software. The Software a necessary resource that would enable farmers and independent repair

shops to compete in the DRS market.

145.  Together, Defendant and the Co-conspirator Dealerships wholly control the market for DRS.

146.  No plausible pro-competitive arguments exist for Defendant's and the Coconspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

147.  As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT TWO

### Violation of Section 1 of the Sherman Act

### Conspiracy in Restraint of Trade

### 15 U.S.C. § 1

148.  Plaintiff incorporates and realleges, as though fully set forth herein, the allegations set forth in the preceding paragraphs of this Complaint.

149.  Beginning in or around 2000, Defendant entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce with Co-conspirator Dealerships in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

150.  Defendant engaged in predatory and anticompetitive behavior by restricting competition among its affiliated Dealerships. This unfairly suppressed price competition for DRS and unreasonably restrained trade.

151.  Defendant's conduct included concerted efforts, actions and undertakings among Defendant and the Co-conspirator Dealerships. This conduct had the intent, purpose, and effect of artificially suppressing competition from smaller dealerships.

152.  Defendant perpetrated the scheme with the specific intent of reducing competition in the DRS market to the benefit of Defendant and the Co-conspirator Dealerships.

153. Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

154. Plaintiff and Class Members paid higher rates for DRS from Deere and its Co-Conspirator Dealerships than they otherwise would have in the absence of Defendant's unlawful conduct. As a result, Plaintiff and Class Members have been injured in their property and have suffered damages in an amount according to proof at trial.

155. Defendant's contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

156. In the alternative, Defendant is liable under a "quick look" analysis where an observer with a rudimentary understanding of economics could conclude that the arrangements in question would have anticompetitive effects on customers and markets.

157. Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

158. As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT THREE

### Violation of Section 1 of the Sherman Act

### Unlawful Tying Arrangement

### 15 U.S.C. § 1

159. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

160. This cause of action is brough under Section 1 of the Sherman Act, 15 U.S.C. § 1.

161. A tying arrangement exists when a seller exploits power over one product (the tying product) to force the buyer to accept a second product (the tied product). *Henry v. A.B. Dick*

*Co.*, 224 U.S. 1, 32 S. Ct. 364, 56 L. Ed. 645, 1912 Dec. Comm'r Pat. 575 (1912). Such an arrangement violates Section 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and the arrangement affects a substantial volume of commerce in the tied market. *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 832 (7th Cir. 2014).

163. Deere Tractors and DRS are distinct and separate products and services.

164. Plaintiff and Class members through their purchase of Deere Tractors were forced into purchasing a second tied product, DRS, from Defendant and its Co-Conspirator Dealerships.

165. Defendant's aggressive consolidation of its affiliated Co-conspirator Dealerships materially changed the makeup of the DRS Market, drastically reducing the pressure of pricing competition among the Dealerships.

166. Furthermore, Defendant represented to Plaintiff and the Class that most necessary tools were available and that almost all repairs could be done on the Tractors without the Software. This was not true. These misleading statements meant that Plaintiff and the Class could not, from Deere's representations, engage in an accurate prediction of the total lifetime costs for Deere Tractors before had to purchase DRS from Defendant and the Dealerships.

167. As set out above, Defendant has appreciable economic power in the relevant Tractor Markets, i.e., the "tying" markets.

168. This tying arrangement affected a substantial amount of interstate commerce.

169. Defendant's conduct amounts to a per se tying violation, as Defendant has significant power in the tying markets which has led to a significant and actual impact on competition in the DRS market.

170. Alternatively, Defendant's conduct is an illegal tying scheme under the rule of reason, as Defendant's actions to coerce farmers to purchase DRS from Defendant constitutes an unreasonable restraint on competition in the market for DRS.

171. There are no legitimate business justifications for Defendant's illegal tying arrangement. Defendant has a substantial economic interest in sales of DRS.

## **COUNT FOUR**

**Violation of Section 2 of the Sherman Act**

**Attempted Monopolization in the Alternative**

**15 U.S.C. § 2**

172.  Plaintiff incorporates and realleges, as though fully set forth herein, the allegations set forth in the preceding paragraphs of this Complaint.

173.  As detailed above, Deere has monopoly power in the DRS Market, including the power to control prices and exclude competition.

174.  Deere has willfully, knowingly, and with specific intent to do so, attempted to monopolize the DRS Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

175.  Deere's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the DRS Market. Deere's ongoing anticompetitive conduct presents a dangerous probability that Deere will succeed, if it has not already, in its attempt to monopolize the DRS Market.

176.  As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for DRS; and (ii) the lack of availability of independent DRS and self-repair options.

## <u>COUNT FIVE</u>

**Violation of Section 2 of the Sherman Act**

**Monopolization**

**15 U.S.C. § 2**

177.  Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

178.  This cause of action is brough under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

179.  Deere has total monopoly power in the DRS Market, including the power to control

prices and exclude competition absolutely.

180. Deere has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

181. Deere has unreasonably restrained, and further threatens to unreasonably restrain competition in the DRS Market by:

(a) restricting the availability of the Software that is required in order to perform diagnostics and repairs for Deere Tractors;

(b) knowingly misrepresenting the availability and necessity of the Software that is required for diagnostics and repairs for Deere Tractors;

(c) tying the purchase of DRS to the purchase of Deere Tractors; and

(d) limiting farmers' rights over their own Tractors through the terms of the 2016 EULA with the goal of restricting farmers' ability to perform DRS themselves or via an independent repair shop.

182. While these anticompetitive acts themselves can constitute an individual antitrust violation on a stand-alone basis, when taken together they form a broader monopolization claim.

183. As a direct and proximate result of Deere's anticompetitive and facially monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) the payment of supracompetitive prices for DRS; and (ii) the lack of availability of independent repair options.

<u>**COUNT SIX**</u>

**Violation of Section 2 of the Sherman Act**

**Conspiracy to Monopolize**

**15 U.S.C. § 2**

184. Plaintiff incorporates and realleges, as though fully set forth herein, the allegations set forth in the preceding paragraphs of this Complaint.

185. Beginning approximately in 2000 and continuing thereafter to the present,

Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly conspired with Co-conspirator Dealerships to jointly boycott entities that would reduce prices of DRS in the United States, in order to acquire monopoly power in the DRS market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

186. Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a prerequisite for the independent performance of DRS.

187. Deere and the Dealerships have willfully, knowingly, and with specific intent to do so, conspired to monopolize the DRS Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

188. There are no plausible pro-competitive arguments for Defendant and the Coconspirator Dealerships' refusal to sell the Software.

189. As a direct and proximate result of Deere and the Dealerships' conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## **COUNT SEVEN**

**Violation of Section 2 of the Sherman Act**

**Monopoly Leveraging**

**15 U.S.C. § 2**

190. Plaintiff incorporates and realleges, as though fully set forth herein, the allegations set forth in the preceding paragraphs of this Complaint.

191. As detailed above, Deere has monopoly power over the Software.

192. Deere has willfully and intentionally used its monopoly power over the Software to acquire or maintain monopoly power in the DRS Market, specifically, by tying purchases of Deere Tractors to DRS through its deliberate prevention of access to the Software necessary to run diagnostics, approve repairs, and perform maintenance. There are no legitimate consumer benefits

to justify Deere's actions.

193. Furthermore, Deere also leveraged its monopoly power over Deere Software to effectuate the 2016 EULA. This limited farmers' ownership rights over their own Tractors and forced farmers to purchase DRS. The EULA impermissibly restricts farmers' ability to perform DRS themselves by banning any attempts to reverse engineer, adapt, or otherwise circumvent the Software. Deere threatens that it may terminate the license to the Software—and thus access to a functional Tractor—if a farmer interacts with the Software in a way that Deere considers a violation of the EULA.

194. Deere willfully has acquired or maintained monopoly power via exclusionary conduct, rather than through legitimate business or innovation.

195. As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for DRS; and (ii) the lack of availability of independent DRS and self-repair options.

**COUNT EIGHT**

**Violation of Sections 1 and 2 of the Sherman Act**

**Declaratory and Injunctive Relief**

**15 U.S.C. §§ 1, 2**

196. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

197. Plaintiff seek declaratory and injunctive relief under the Sherman Act for violations of Sections 1 and 2 of the Sherman Act, as alleged.

198. Plaintiff's allegations described herein constitute violations of Sections 1 and 2 of the Sherman Act.

199. Deere effectuated an illegal tying arrangement for Tractors and DRS as well as a scheme to restrain trade and monopolize a market.

200. There are no, non-pretextual, pro-competitive business justifications for Deere's

conduct that outweighs its harmful effects.

201. As a direct and proximate result of Deere's illegal tying arrangement and monopolistic and anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed.

202. The goal, purpose, and/or effect of the tying arrangement and monopolistic and anticompetitive scheme was to prevent repairs outside the Deere ecosystem in order to continue charging supracompetitive prices for DRS.

203. Plaintiff and the Class have been injured in their business or property by reason of Deere's antitrust violations as alleged in this Complaint. The injury consists of paying higher prices for DRS than they would have paid in the absence of those violations. These injuries will continue unless halted.

204. Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Deere's conduct constitutes a violation of Sections 1 and 2 of the Sherman Act.

205. Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Deere's unlawful conduct.

## COUNT NINE

### Promissory Estoppel

206. Plaintiff incorporates and realleges, as though fully set forth herein, the allegations set forth in the preceding paragraphs of this Complaint.

207. Defendant made unambiguous promises through statements to Plaintiff and the Class that Deere Tractors would be able to be repaired through software, tools, and resources made available by Deere and its Dealerships – and that consumers would not have to solely rely on DRS through Deere and its Dealerships.

208. Plaintiff and the Class relied on Defendant's promise in their purchases, leases, and continued use and operation Deere Tractors, and that reliance was both expected and foreseeable.

209. Plaintiff and Class members' reliance on Defendant's promises were to their

detriment. Plaintiff and the Class have paid, and continue to pay, much higher rates for DRS than they would have had Defendant fulfilled its promise.

## COUNT TEN

### Unjust Enrichment

210.  Plaintiff incorporates and realleges, as though fully set forth herein, the allegations set forth in the preceding paragraphs of this Complaint.

211.  Deere has benefitted from the monopoly profits on the sale of DRS resulting from the unlawful and inequitable acts alleged in this Complaint.

212.  Deere's financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for DRS by Plaintiff and the Class.

213.  Plaintiff and the Class have conferred upon Deere an economic benefit, in Deere's profits resulting from the unlawful overcharges and from the monopolization of the DRS market, to the economic detriment of Plaintiff and the Class.

214.  The economic benefit of overcharges and monopoly profits derived by Deere through Plaintiff's payment of supra-competitive and artificially inflated prices for DRS is a direct and proximate result of Deere's unlawful practices.

215.  The financial benefits derived by Deere rightfully belong to Plaintiff and the Class.

216.  It would be inequitable under unjust enrichment principles in the fifty states and the District of Columbia for Deere to be permitted to retain any of the overcharges for DRS derived from the illegal conduct described in this complaint.

217.  Deere is aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

218.  Deere should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

219. A constructive trust should be imposed upon all unlawful or inequitable sums received by Deere traceable to Plaintiff and the Class.

## IX.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class of all others so similarly situated, respectfully requests judgment against Defendant as follows:

220. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

221. The unlawful conduct herein be adjudged and decreed in violation of Sections 1 and 2 of the Sherman Act.

222. Plaintiff and the Class recover damages, to the maximum extent allowed, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent the laws permit;

223. Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from engaging in other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

224. Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

225. Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

226. Plaintiff and the members of the Class have such other and further legal or equitable relief as the case may require and the Court may deem just and proper.

## X.     JURY TRIAL DEMANDED

227. Plaintiff demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Date: June 29, 2022

Respectfully Submitted,

/s/Bryan J. O'Connor
Bryan J. O'Connor
**WHITESIDE & GOLDBERG, LTD.**
155 N. Michigan Ave. - Suite 540
Chicago, IL 60601
Phone: (312) 334-6875
Fax: (800) 334-6034

Ruth Rizkalla*
**THE CARLSON LAW FIRM, P.C.**
1500 Rosecrans Avenue, Suite 500
Manhattan Beach, CA 90266
O: 800-359-5690
F: 254-526-2325

John Fabry*
**THE CARLSON LAW FIRM, P.C.**
1717 N. IH-35, Suite 305
Round Rock, TX 78664
O: 512-671-7277
F: 512-238-0275

William M. Audet (SBN 117456)*
Ling Y. Kuang (SBN 296873)*
Kurt D. Kessler (SBN 327334)*
**AUDET & PARTNERS, LLP**
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Telephone: 415.568.2555
waudet@audetlaw.com
lkuang@audetlaw.com
kkessler@audetlaw.com

*Application for pro hac vice admission forthcoming*

*Counsel for Plaintiff and Proposed Class*